The Honorable Michelle L. Peterson

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

AL M. TALAGA,

Defendant.

NO. MJ20-469

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION**

Detention Hearing: September 23, 2020 at 1:00 p.m.

The United States of America, by and through Brian T. Moran, United States Attorney for the Western District of Washington, and Catherine L. Crisham, Assistant United States Attorney for said District, hereby files this memorandum regarding its Motion for Detention. For the reasons set forth below, the government respectfully submits that it has met its burden to show by a preponderance of the evidence that the Defendant poses a flight risk and by clear and convincing evidence that the Defendant poses a danger to the community if released from custody.

## I. BACKGROUND

The facts of this case are set forth in the Complaint. *See* Docket No. 1. In short, on June 1, 2020, at approximately 6:44 p.m., several Seattle Police Department (SPD)



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

officers responded to a report of a burglary in progress at the Sneaker City store, located at 110 Pike Street in Seattle, Washington. Sneaker City is an independently owned store featuring shoes and other footwear. The store has been closed to the public since March, with boarded up windows and entrances, due to the COVID-19 epidemic.

As investigating officers arrived at the scene, they observed several individuals exiting the store through a broken alley window from which the exterior wood cover had been removed. SPD officers attempted to detain these individuals, but several of them ran away when ordered by officers to stop. In addition, as the SPD officers were arriving at the scene, a vehicle that had been parked nearby fled the scene by driving down the sidewalk in the 100 block of Pike Street, nearby hitting an officer and two suspects he was attempting to detain. Officers spoke with two different witnesses, each of whom reported seeing a number of people entering Sneaker City and then rapidly dispersing when they heard police sirens. One witness stated that he saw a number of individuals removing merchandise from Sneaker City, and that he had seen individuals bring several loads of presumably stolen property and place it in a dark colored Dodge Magnum, bearing Washington license plate AHG3684. According to the witness, all of the vehicles except the Magnum had fled the parking lot upon hearing police sirens.

Law enforcement subsequently ran a search of the vehicle and learned that it was registered to Defendant Al Talaga, with an address in Auburn, Washington. The Dodge Magnum had very dark tinted windows, and SPD Officer Brewer conducted a safety sweep of the vehicle to ensure no one was hiding inside the vehicle. During this visual security check, Officer Brewer saw several items of what appeared to be new merchandise of the type that one would find in a shoe store, including socks and shoes, as well as a black handgun in the driver's side door panel. Seeing no suspects inside the Dodge Magnum, Officer Brewer then closed the door and secured the vehicle at the scene. The vehicle was subsequently towed to the secure SPD Vehicle Processing Room



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in anticipation of a search warrant to recover any stolen and/or illegal items from the vehicle.

SPD Detective Poblocki used a law enforcement database to obtain a phone number associated with Talaga. Just before midnight on June 2, 2020, Detective Poblocki called this number and spoke with a male who identified himself as Talaga. Talaga initially stated that his Dodge Magnum had been stolen the previous night, sometime after noon, in Kent, Washington. Talaga then continued to talk to Detective Poblocki. During the course of this conversation, Talaga eventually admitted that his car had not really been stolen, and that he had been in the area of First and Pike Street in Seattle on June 1, 2020.

When Detective Poblocki asked if there were any weapons or valuables inside the Dodge Magnum, Talaga advised that a Glock 22 pistol was stored inside the glove compartment. Talaga stated the firearm belonged to his girlfriend, K.B. Talaga admitted that he is not legally able to possess firearms. Talaga has prior felony convictions, including a 2005 conviction for *Robbery in the Second Degree*, in cause number 05-C 09559-4, in the Superior Court of King County. As a result of this conviction, Talaga is prohibited from possessing firearms.

Talaga told Detective Poblocki that his fingerprints and DNA would likely be on the firearm located inside the Dodge Magnum, because he had moved it from the glove box to another compartment in the car. Talaga further admitted that he had broken through the window at Sneaker City, gone inside, and stolen several items from inside the store. Talaga told Detective Poblocki that there would be "a lot" of Sneaker City merchandise inside the Dodge Magnum. Talaga stated that his girlfriend was not present during the burglary of Sneaker City. Talaga told Detective Poblocki that the reason he had burgled Sneaker City was because the police had killed his friend. Talaga said "that's why I'm taking out my anger like that." He further stated that "it's going to make me happy because I know that my tax dollar that I'm paying, I'm taking it right back."



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Near the end of the interview, Detective Poblocki asked Talaga if the Kent address was a good place to mail the court paperwork. Talaga replied that he "will not be [at that address]" and that he "comes back and forth."

On June 4, 2020, at approximately 4:15 p.m., Detective Poblocki obtained and served a search warrant on the Dodge Magnum. During the search of Talaga's vehicle, officers recovered a loaded Glock Model 22 .40 caliber pistol, bearing serial number BCKX120, from the driver's side door panel. Officers also located a FNP Model 40 .40 caliber pistol, bearing SN 61CMR09373, underneath the floor mat, on the front passenger side. The FNP pistol was loaded with eleven bullets, including a round in the firing chamber. A law enforcement database check verified that the FNP Model 40 pistol had been reported as being stolen in 2019 from a residence in Tacoma during a home invasion robbery.

During the search of Dodge Magnum law enforcement also located a black bag in the back seat that contained seven new pairs of Air Jordan shoes in original packaging; two new ball caps; six individually packaged pairs of "Seattle" socks with the image of Seattle downtown skyline; two packs of Nike socks, and a pair of black Adidas shoes. The aforementioned property appeared to be the type sold in the Sneaker City business. An employee of Sneaker City later confirmed the above-delineated apparel items had been from Sneaker City. Law enforcement also located a new cell phone, still in its box, inside the black bag.

## II. DISCUSSION

### A. The Legal Standard

In ruling on a motion for pretrial detention, the Court must determine whether any condition or combination of conditions will reasonably assure the appearance of the defendant as required, and the safety of any other person and the community. 18 U.S.C. § 3142(f). The Bail Reform Act provides that a court should detain a defendant pending trial if "no condition or combination of conditions . . . will reasonably assure the



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The "government bears the burden of showing by a preponderance of evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community." *United States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir. 1991) (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). The government may present evidence by way of evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors. *See, e.g. United States v. Salerno*, 481 U.S. 739, 743 (1987); *United States v. Winsor*, 785 F.2d 757 (9th Cir. 1986).

The defense contends, erroneously, that the government must meet a heightened preponderance standard – what the defense calls "'clear preponderance of the evidence,' as opposed to the more ordinary preponderance standard" – and cites *Motamedi* as support for that proposition. *See* Docket No. 3 at 4. In fact, *Motamedi* imposes no such heightened preponderance standard on the government. Rather, the *Motamedi* Court established the different standards for establishing risk of flight versus danger to the community – namely, that "[i]n the trial court and in this court, the Government must establish risk of flight by a clear preponderance of the evidence, not by the higher standard of clear and convincing evidence." *See Motamedi*, 767 F.2d at 1406 -7 ("concluding" that "the Government's burden in denying bail on the basis of flight risk is that of the preponderance of the evidence"). There is nothing in *Motamedi* that suggests that the government is required to meet a *heightened* preponderance standard in establishing risk of flight, nor does the *Motamedi* Court in any way delineate the supposed difference between this standard and the so-called "more ordinary preponderance standard." *See* Docket No. 3 at 4.

The defense also contends that the government must "demonstrate extreme and unusual circumstances in order to justify detaining a defendant as a risk of flight. *See id.*



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In making this argument, the defense relies not on the statutory language or case law after the imposition of the Bail Reform Act of 1983, but rather upon "case law cited to by Congress when they adopted § 3142(f)(2)." *See id.* However, neither the Act itself nor any cases interpreting the Act impose such a request on the government. Finally, the defense is simply incorrect to state that *Motamedi* stands for the broad proposition that "courts must err on the side of release even if the individual has significant assets provided they have some ties to the community." *See id.* at 5. Once again, *Motamedi* states no such thing and it is unclear what the defense's basis is for this contention. Rather, the case law is clear – this Court need only consider whether the government has established that Talaga is a flight risk by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1407.

The Bail Reform Act identifies four factors that a court should consider in analyzing a detention motion: "(1) the nature and circumstances of the offense charged, including whether the offense . . . involves a firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including (A) the person's character,. . . family ties, employment, financial resources length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation [or] on parole . . .; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . ."

**B. Talaga Should Be Detained as a Flight Risk and a Danger**

For the reasons set forth below, the government submits that each of the statutory factors listed in § 3142(g) weighs in favor of pretrial detention in this case. There is no combination of conditions that will reasonably ensure Talaga's presence at future court proceedings or the safety the community. Rather, Talaga poses both a serious flight risk



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and a danger to the community. Therefore, a pretrial detention order is necessary and appropriate in this case.

First, the offense Talaga committed was both violent and dangerous. As described in the Complaint, Talaga took advantage of the chaos and unrest in downtown Seattle on June 1, 2020, to loot a family-owned business, all while driving a car containing two firearms (one of them stolen) that he is prohibited from possessing. Talaga was one of a relatively small number of people who hijacked otherwise lawful protests, intended to highlight the issue of racial injustice, to vandalize and steal merchandise from a small business that had been closed for months due to COVID-19. Talaga chose to make the situation even more dangerous by bringing firearms to the scene, despite his own admission that he is not permitted to possess firearms. One of those firearms (the Glock pistol) was recovered from the driver's side door panel, further establishing that Talaga intentionally placed the firearm somewhere where he would have easy access to it while engaging in looting activities in downtown Seattle. The nature and circumstances of Talaga's offenses weigh strongly in favor of detention.

Second, the strength of the evidence against Talaga also weighs in favor of detention. As set forth in the Complaint, after initially claiming that his car had been stolen, Talaga eventually admitted to law enforcement that he had been present at the protests, that he had participated in looting the Sneaker City store, and that he had knowingly driven a car with a Glock 22 pistol inside, despite the fact that he is not legally able to possess firearms.

Third, Talaga's history and characteristics further weight in favor of detention. As set forth in the Pretrial Services Report, Talaga has a long and extensive criminal history. These include two convictions for Robbery in the Second Degree,[1] as well as convictions for obstructing a police officer, disorderly conduct, threats to do harm, malicious

[1] Talaga's 2004 conviction for Robbery Second Degree was resolved as a juvenile conviction. According to the Pretrial Report, Talaga was originally charged as an adult with Robbery in the First Degree.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

mischief, and harassment. As discussed in greater detail below, Talaga has myriad instances of failing to appear on his criminal charges, and has two pending bench warrants from 2018.

Most concerning to the government are the circumstances of Talaga's 2015 convictions for Assault of a Child in the Third Degree and No Contact Order Violation. The judgment and sentence for that conviction, as well as the charging documents, are attached as Exhibit 1. *See* Judgment and Sentence and Information for *State v. Talaga*, No. 15-1-01280-7 KNT, at 2. As set forth in the certification for probation cause, Talaga was charged with assaulting the four year old son of his girlfriend by hitting the child in the face with a phone charging cord because he was crying for his mother and would not stop crying. *See* Exhibit 1 at 12. The responding officer described the four year old victim as having "a long streak which stretched from under his left eye toward his left ear as well as other streaks which extended out from the main one." *See id.* These injuries "were consistent with a whip to the face with a phone charger" and "two whip lines were present, one of which was directly under [the child's] left eye." *See id.* The certification further noted that at the time of the assault, Talaga was subject to a no contact order that required him to stay away from the girlfriend's residence and restrained him from assaulting, abusing, or harassing the girlfriend or her children. Talaga pled guilty to these charges and was sentenced to a term of imprisonment of nine months.

Finally, Talaga's release would pose an extremely serious danger to the community. As noted above, Talaga has a very concerning criminal history, particularly given his age. Contrary to his counsel's suggestion that Talaga has turned over a new leaf and is interested in living a law-abiding life, Talaga's involvement in the June 1 looting incident and his decision to possess firearms, despite being prohibited from doing so, suggest that he will continue to engage in criminal conduct so long as he is not detained.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C. Talaga Is A Flight Risk**

The evidence also makes clear that Talaga is a flight risk. As set forth in the Pretrial Report, he has failed to appear for court hearings eighteen times, including for a case filed in 2018. This long history of defying court directives make clear that Talaga does not take seriously the importance of appearing in court on his criminal matters, and does not bode well for following the Court's orders in this matter.

The circumstances of Talaga's arrest also weigh in favor of finding that he presents a significant risk of nonappearance. As an initial matter, defense counsel is incorrect both that this "case is stale" and that the Defendant "did not run" after his conversation with SPD Officer Poblacki in June 2020. Rather, law enforcement has had a difficult time attempting to locate Talaga and executing his arrest warrant. Officers conducted surveillance at the Auburn address listed on his Washington State Department of Licensing registration for his vehicle but never located him there. Furthermore, the Defendant explicitly told Detective Poblacki that his car had been stolen from his parents' Kent address, but that he "would not be there" to receive court paperwork and that he "comes back and forth." In fact, this is the address where Talaga was ultimately contacted by law enforcement and where he told the Probation Office that he has been living the past four years.

As a result, law enforcement was required to resort to more sophisticated surveillance measures to locate Talaga. Once it did so, it learned that Talaga spent the night at four different locations in a span of ten days. Law enforcement ultimately located Talaga at his parents' residence in Kent on September 15, 2020 (the same residence where he told Officer Poblacki he would not be) and arrested him there.

The circumstances of Talaga's arrest also make clear that he presents a flight risk. Defense counsel contends that Talaga was "cooperative with police." *See* Docket No. 3. This is not so. On the contrary, as set forth in the Report of Investigation detailing Talaga's arrest, attached hereto as Exhibit 2, Talaga did not initially surrender himself



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

when law enforcement came to his home. As set forth in the report, law enforcement had spent most of the day in front of the Kent residence and had confirmed that Talaga was inside. At 5:22 p.m., law enforcement approached the Kent residence and attempted to initiate contact with him at the front entrance. Kent Police Department (KPD) Officer Eric Steffes repeatedly announced KPD's and ATF's presence and requested that Talaga to come to the front door. When there was no respons, Officer Steffes continued announcing for the occupants of the residence to come to the front door over his police vehicle's Public Announcement (PA) system, to include chirping the siren. Officer Steffes also announced multiple times that the police had a warrant for Talaga's arrest. ATF Resident Agent in Charge Jon Hansen attempted to reach Talaga over the cellular phone but was unsuccessful.

At approximately 5:34 p.m., other occupants of the residence, including Talaga's mother, F.T., arrived at the scene. F.T. was asked to aid law enforcement personnel in contacting with Talaga and requesting him to exit the residence. During that time, Officer Steffes continued making announcements over the police vehicle's PA system, asking Talaga to exit the residence and announcing there was a warrant for Talaga's arrest. Despite all these notifications, Talaga did not exit the residence until 5:45 p.m. According to arresting officers, he appeared distraught, had an elevated voice and claimed he was unaware that the police were at the residence—despite the fact that the officer had been calling for him to surrender over the PA system for over twenty minutes and the unsuccessful attempts to reach him by cell phone.

The circumstances of Talaga's arrest make clear that Talaga is not someone who can be guaranteed to appear for his court appearances. On the contrary, he affirmatively misled Officer Poblacki about where law enforcement could locate him and said that he "will not be" at the Kent residence where he now claims he has been living for four years. When law enforcement came to his home to arrest him, he essentially barricaded himself into the residence and refused to surrender on his warrant until his mother came to the



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

home and, presumably, convinced him to do so. Talaga's actions towards law enforcement prior to his arrest are extremely concerning and clearly establish that he is a risk of nonappearance at trial.

**D. Talaga's COVID-19 Risk Factors are Irrelevant to Detention**

Finally, Talaga devotes a significant portion of his memorandum to arguing that given his obesity, his potential risk of exposure to COVID-19 at FDC Sea-Tac is "incompatible with the concept of human dignity and [has] no place in civilized society." *See* Docket No. 3 at 6. Although any number of positive test results for the virus are of concern, Talaga's motion is devoid of any showing that FDC SeaTac is unequipped to provide appropriate medical treatment if he were to become infected with the virus. Nor does Talaga assert any facts to demonstrate that he faces a greater risk while in custody than what he would face in the community if released, including on a fishing boat in Alaska, where he claims to be intending to seek employment.

While any outbreak at a federal detention center is serious, release into the community does not guarantee Talaga will not be exposed to COVID-19. Furthermore, a defendant's fear of contracting COVID-19 has no "material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community," 18 U.S.C. § 3142(f)," and thus does not justify pretrial release for a defendant, like Talaga, who is clearly both a flight risk and a danger to the community.

Courts in our district and nationwide have consistently reached this conclusion. *See, e.g., United States v. McKnight*, No. CR18-16 TSZ, 2020 WL 1872412, at *1 (W.D. Wash. Apr. 15, 2020) (collecting cases); *United States v. Sanford*, No. CR19-0172 JLR, 2020 WL 2114402, at *3 (W.D. Wash. May 4, 2020) (denying motion "founded on speculation regarding the risk that [defendant] will contract COVID-19 while he is at the FDC and speculation regarding the impact any such infection would have on his health should he contract the disease").



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As these courts have "made clear," "the governing legal standard" when determining pretrial detention "is not the harms that a defendant's incarceration might cause (however substantial), but rather the danger that would be posed by the person's release." *Sanford*, 2020 WL 2114402, at *3. "A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm to *the defendant* does not usually bear on this analysis." *United States v. Clark*, 448 F. Supp. 3d 1152, 1156 (D. Kan. 2020).

Talaga ignores this caselaw. Instead, he relies on a number of cases in other districts in which the government conceded that obesity is a "extraordinary and compelling" reason weighing in favor of early reason, but ultimately opposed release on dangerousness or other grounds in all but one of those cases. *See* Docket No. 3 at 3. Talaga presents no additional information about each of those defendant's history or characteristics, nor about each court's ultimate decisions regarding early release. As such, those cases have no precedential or persuasive value here.

Because Talaga's fears about contracting COVID-19 at FDC SeaTac have no bearing on the danger and flight risk that releasing him would pose, those fears do not justify releasing Talaga despite the clear evidence that he is both a flight risk and a danger to the community. That this worry may have grown more acute in the last few months, as inmates and staff tested positive for the virus, does not change the analysis: Talaga bases his motion on fear of a possible future infection that is also likely if he is released on bond. And that remains an invalid basis for releasing Talaga.

## V. CONCLUSION

For the foregoing reasons, the government respectfully submits that it has met its burden to demonstrate by a preponderance of the evidence that Talaga is a flight risk and by clear and convincing evidence that Talaga presents a danger to the community. There



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

is no combination of factors that ensures appearance or safety to the community if Talaga is released from custody.

DATED this 22nd day of September, 2020.

Respectfully submitted,

BRIAN T. MORAN
United States Attorney

*/s/ Catherine L. Crisham*
CATHERINE L. CRISHAM
Assistant United States Attorney
United States Attorney's Office
700 Stewart, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-8451
Fax: (206) 553-0755
E-mail: catherine.crisham@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record for the defendant(s).

*/s/ Josielynn Estrella*
JOSIELYNN ESTRELLA
Paralegal
United States Attorney's Office
700 Stewart, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-4222
Fax: (206) 553-0755
E-mail: josielynn.estrella@usdoj.gov